1

2

3

4

5

6

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

7

8

9

10

11

12

| | |
|---|---|
| **BRIAN GIBBS,** | **1:14-cv-239-LJO-BAM** |
| **Plaintiff,** | **MEMORANDUM DECISION AND** |
| **v.** | **ORDER RE DEFENDANT'S MOTION** |
| | **FOR SUMMARY JUDGMENT (Doc. 11)** |
| **KAPLAN COLLEGE aka KAPLAN HIGHER** | |
| **EDUCATION, LLC,** | |
| **Defendant.** | |

13

14

15             **I. <u>INTRODUCTION</u>**

16          Plaintiff Brian Gibbs ("Plaintiff") brings this case against his former employer, Defendant

17   Kaplan College aka Kaplan Higher Education, LLC ("Defendant" or "Kaplan") for alleged unlawful

18   employment practices. *See* Doc. 1-6, Ex. A, Complaint ("Compl.") at 1. Plaintiff began his employment

19   with Kaplan on September 15, 2008, and remained there until December 3, 2013, when his employment

20   was terminated. *See id.* at ¶ 1; *see also* Doc. 17-2 ("UMF[1]") 1, 63. During that time, Plaintiff claims he

21

22   _____

23   [1] "UMF" refers to the parties' "undisputed material facts." Docs. 17-2, 17-3. The Court notes at the outset that there are serious evidentiary problems with Plaintiff's almost 400 "additional facts," which total 47 pages. Doc. 16-2. Plaintiff submitted almost 400 additional facts, the overwhelming majority of which are not sufficiently supported (or not supported at all) by the cited evidence. *See generally* Doc. 17-3. Due to the dozens of instances where counsel for Plaintiff, Shelley G.

24   Bryant, mischaracterized the cited evidence—namely, witnesses' deposition testimony—it is difficult to believe those mischaracterizations were unintentional or based on a genuinely different understanding of the evidence. *See, e.g.*, UMF 239, 322, 344, 366. In addition, Mr. Bryant accuses Kaplan of lying to the California Department of Fair Employment and

25   Housing ("DFEH"), and accuses two witnesses of lying in their depositions without valid evidentiary support. *See* UMF 239,

1  was subjected to various unlawful employment practices by numerous Kaplan employees and ultimately

2  was discharged unlawfully. *See* Compl. at 1. Based on that conduct, Plaintiff brings various causes of

3  action.

4       Kaplan moves for summary judgment on all of Plaintiff's claims. *See* Doc. 11 at 1-5. Kaplan

5  argues that none of Plaintiff's claims has merit because "[t]he evidence shows that Kaplan treated [him]

6  fairly and made decisions without regard to any protected status or activities." Doc. 11-1 at 8. In

7  Kaplan's view, Plaintiff's termination was due to his long-standing and objectively measured

8  substandard performance. *See id.* at 7-8.

9       The Court finds it appropriate to rule on Kaplan's motion for summary judgment without oral

10  argument. *See* Local Rule 230(g); Doc. 18. For the following reasons, the Court GRANTS the motion in

11  its entirety.

## II. FACTUAL AND PROCEDURAL BACKGROUND[2]

13       Plaintiff was hired as an Instructor of Criminal Justice ("CJ") at Kaplan's Fresno campus, where

14  he began work on September 15, 2008. UMF 1-2. As a CJ Instructor, Plaintiff's duties included

15  participating in retention activities aimed at preventing students from dropping out. UMF 4.

16       In May 2009, Plaintiff was promoted to the position of CJ Program Director. UMF 5. In that

17  capacity, he was responsible for oversight of the CJ program at Kaplan's Fresno campus. UMF 6.

18  Among other things, he was responsible for meeting corporate-set expectations for his program's

19  performance, advising students on academic progress, managing student drops, and helping to promote

20  student retention." UMF 7. "Specifically, [he] was responsible for managing the gross drop rates,

21  absence rates, and placement rates of students in the CJ program." UMF 8. Through 2009 and 2010,

22  Plaintiff's performance was satisfactory or exceeded expectations. *See* UMF 170, 172, 173-75.

---

24  321, 384, 433. Put bluntly, Mr. Bryant blatantly and repeatedly mischaracterizes the evidence. If this case had survived summary judgment, the Court likely would have initiated a sanctions proceeding under Rule 11.

25  [2] The following facts are not credibly disputed. The Court will address only the facts, arguments, and evidence (and objections thereto) necessary to rule on Defendant's motion for summary judgment.

1    Plaintiff reported directly to the campus Director of Education, Ruched Siagan ("Siagan") and to

2    the then-campus President, Allison Hawkins ("Hawkins"). UMF 9-10. Siagan and Hawkins socialized

3    together while at work and outside of work prior to Hawkins's termination, including text messaging

4    one another. Doc. 16-3, Ex. C., Deposition of Ruched Siagan ("Siagan Depo.") at 22:3-14. They have

5    remained in contact through at least November 2014. *See id.* at 23:15-19.

6        In November 2011, Plaintiff complained to Siagan that Hawkins had been sexually harassing

7    him. UMF 10, 178. Specifically, Plaintiff complained that Hawkins

8    > was making comments or asking [Plaintiff] a lot of questions regarding [his] sex life. She asked
     > [him] about [his] sex life with [his] wife. She asked [him] about if [he] was having sex with

9    > another instructor. She made inappropriate comments, such as "you better not be sleeping with
     > your wife," and "you better not be sleeping with an instructor." [Plaintiff] also told [Siagan] that

10   > [he] was getting mail at [his] house in [Hawkins's] name.

11   Doc. 11-2, Ex. A, Deposition of Brian Gibbs ("Gibbs Depo.") at 131:1-10; *see also* UMF 179.

12       Siagan did not relay immediately Plaintiff's allegations concerning Hawkins's behavior to

13   Human Resources ("HR"), although she was supposed to do so. UMF 12-13; Gibbs Depo. at 131:18-25;

14   Doc. 11-2, Ex. D; Siagan Depo. at 20:8-10; UMF 180. Siagan told Hawkins that Plaintiff "says you're

15   harassing him." Siagan Depo. at 29:12-20.

16       Within two weeks, however, Plaintiff reported Hawkins's conduct to HR. UMF 16. Kaplan

17   investigated the complaint. UMF 184. Hawkins was terminated in November 2011, shortly after Plaintiff

18   reported her to HR. Gibbs Decl. at 132:13-20; *see also* Doc. 11-5, Declaration of Susan Bolon ("Bolon

19   Decl."), at ¶ 3. "Hawkins was terminated as a result of complaints made by [Plaintiff]," Doc. 11-1 at 9

20   n.5; Bolon Decl. at ¶ 3, although Kaplan could not substantiate those complaints. UMF 20. Hawkins

21   never returned to Kaplan. UMF 18.

22       Because Siagan did not report Plaintiff's complaints about Hawkins to HR, Siagan also was

23   disciplined. Siagan Depo. 20:8-25. Siagan received a "final written warning." *Id.* at 20:23-25.

24   Specifically, Siagan received a final written warning "for not escalating the complaint to [HR] when she

25   received [Plaintiff's] concerns." Doc. 16-3, Ex. G, Deposition of Susan Bolon ("Bolon Depo."), at 22:1-

5.

Siagan continued to be Plaintiff's supervisor. *See* UMF 198. In December 2011, Siagan commended Plaintiff for his assistance with an audit. UMF 476. In January 2012, she again commended him for his help with another audit. UMF 476. In February 2012, Siagan commended Plaintiff and others for "doing a great job with the student attrition rate." UMF 478. Siagan was aware that from 2012 through February 2013, Plaintiff's supervisor, Bruno Sablan, had commended Plaintiff's work performance and for helping with work-related projects on at least a handful of occasions. *See* UMF 479-87.

By the summer of 2012, however, Plaintiff's performance assessments began to change. In June 2012, Siagan and others conducted Plaintiff's annual performance review ("the 2011 review").[3] *See* Doc. 16-4, Ex. K, at 2. Siagan gave Plaintiff "Manager Rating: 2.0 [of 5.0] – Satisfactory with Reservation" because the "CJ overall absence rate in 2011 was 20% vs. [Plaintiff's] personal goal to be below 15%. Although goal was not met this year, overall absence rate did improve from 2010." *Id.*; *see also id.* at 8 (documenting "Performance Goal" to "keep absent rates below 15%").

In July 2012, Siagan informed Employee Relations Director Nancy O'Neal ("O'Neal") that she had been having problems communicating with Plaintiff. Doc. 16-3, Ex. E, Deposition of Nancy O'Neal ("O'Neal Depo."), at 12:6-14. In Siagan's view, Plaintiff was "not being cooperative," nor "a team player." *Id.* at 22:18-19. When O'Neal asked Siagan why she could not speak directly to Plaintiff about these and other issues, Siagan explained that she had "been afraid to manage him because she [was] afraid he [was] going to get her in trouble" because "there had been some sexual harassment complaint." *Id.* at 12:25-13:8.[4] The next day, O'Neal met with Siagan and Plaintiff in person to "try to facilitate a

---

[3] Siagan, as Plaintiff's superior, completed the performance review. *See* Doc. 16-4, Ex. K, at 8. Bolon explained that Plaintiff's performance review would not have been completed "in isolation" and that others would have reviewed it, but Bolon did not confirm or identify any individuals who took part in the review process. *See* Bolon Depo. at 34:5-12.

[4] Kaplan objects to the admission of this testimony as inadmissible hearsay. *See* UMF 200. Kaplan's objection is OVERRULED. *See* Fed. R. Evid. 801(d)(2)(D) (statement not hearsay if "offered against an opposing party" and "was made

conversation," *id.* at 13:12, which "seemed to be settled at that time." *Id.* at 35:22-23.

On February 6, 2013, Plaintiff received his annual performance review for 2012 ("the 2012 review"), which Siagan again authored. Doc. 16-4, Ex. L. Among other things, Siagan found that Plaintiff's "2012 YTD absence rate goal was the Kaplan minimum of 12%; internal goal of 10%. [Plaintiff's] 2012 absence rate was 16.4%, which is above the Kaplan minimum goal,[5] internal goal." *Id.* at 2. Siagan's overall rating for Plaintiff was "2.0 – Satisfactory with Reservation." *Id.* at 10. Siagan commented: "in 2013 I will need [Plaintiff] to meet the 3 important metrics he missed this year: gross drop rate, absence rate, and placement." *Id.* Plaintiff acknowledged that his 2012 placement rate was below the rate set in his previous annual review. *See id.* at 3; *see also* Gibbs Depo. at 48:5-8. Siagan explained that the placement rate goal "was missed again making it 3 years in a row that the CJ program has missed the minimum benchmark." Doc. 16-4, Ex. L at 10.[6] The 2012 review also noted that, on February 14, 2013, Plaintiff missed an entire meeting and he missed the first 45 minutes of a meeting on February 22, 2013. Gibbs Depo. at 53:4-16; Doc. 16-5, Ex. LL at 1-2. Plaintiff missed the first meeting because he was meeting with students. Doc. 16-5, Ex. LL at 1. He missed the first 45 minutes of the second meeting because he "was told [he] would not be needed for the first 45 minutes or so." *Id.* at 1-2.

The 2012 review documented that, on February 27, 2013, Plaintiff emailed HR to express his concern that he was "having an issue with management here on campus." Gibbs Depo., Ex. 29, at 1. He alleged that campus management "was keeping him out of the loop and excluding him from meetings concerning his program." UMF 26. In Plaintiff's words, "[b]asically, [campus management personnel] are not available." Gibbs Depo., Ex. 29, at 1. Plaintiff did not express any concern that their lack of

---

by the party's agent or employee on a matter within the scope of that relationship and while it existed").

[5] Kaplan's minimum goals are set by Kaplan corporate headquarters. UMF 76.
[6] Citing to Bolon's deposition testimony, Plaintiff claims that he complained about "Siagan making false allegations about his performance . . . within a few months of Siagan receiving the final written warning." Doc. 16-2 at 7. Bolon's cited testimony does not support that assertion. Rather, when asked whether Plaintiff complained about Siagan's May 2012 performance review of Plaintiff, Bolon stated: "I don't recall [Plaintiff] specifically complaining about the performance evaluation." Bolon Depo. at 33:11-18.

1  communication and availability was retaliatory, discriminatory, or harassing. UMF 27.

2          In the 2012 review, Plaintiff provided a self-evaluation. *See* Doc. 16-3, Ex. L. Plaintiff indicated

3  that students had a number of complaints about career services. *See id.* at 3. Among other things,

4  students complained about how career services informed them that "they only need to work for one day

5  to count as a [job] placement." *Id.* at 3-4.

6          In March 2013, Plaintiff and O'Neal exchanged a series of emails. *See* Gibbs Depo., Exs. 31-35.

7  On March 4, 2013, Plaintiff forwarded to O'Neal a series of emails between Plaintiff and other Kaplan

8  employees from August 2012) ("the August 2012 emails"). Doc. 16-4, Ex. M; Gibbs Depo., Ex. 32-33.

9  Plaintiff alleges that he discussed "compliance"[7] issues in the August 2012 emails. Compl. at ¶ 14; *see*

10 *also* Gibbs Depo., Ex. 33; UMF 160-61. Plaintiff began the email: "Please keep confidential. The intent

11 of this email is to ensure the program remains compliant while improving placement rates." *Id.* at 1.

12 Plaintiff raised various issues with one of Kaplan's employees under his supervision. *Id.* Plaintiff opined

13 that that employee's "weakness is administrative, dealing with compliance issues," and that they had

14 "discussed ideas regarding career placement but some have been dismissed over concerns of

15 compliance." *Id.* Plaintiff explained that he had "to make sure CJ is compliant, for the sake of the

16 program and the campus." *Id.* Among other things, Plaintiff indicated that the students "that left class for

17 the interview [yesterday] have to be marked absent, just like any student that went off campus for an

18 interview." *Id.*

19         In a March 4, 2013 email to O'Neal, Plaintiff stated:

20    I really haven't had a lot of communication with management for a year outside of attendance
      and drops. Since the former ED was terminated, Allison Hawkins (harassment against me), I
21    haven't been involved in the decision making processes. I had sent [HR staff member] Kim
      Guarino an email shortly after [Hawkins] was fired about how uncomfortable I am and how I'm
22    treated differently. I really don't have involvement much with management since then and many
      decisions have been made without me . . . . [M]anagement . . . implement[ed] things in the CJ
23    classes without my knowledge . . . . Another example is the possibility of closing the [CJ]
      program . . . it was mentioned that CJ maybe shut down and this was announced at an all staff

24

25 _____
   [7] "Compliance" refers to Kaplan's compliance with applicable laws and regulations.

6

meeting which I was not in attendance . . . I was not informed . . . . These are just a few examples of me being kept out of involvement since [Hawkins] was fired. Seems like they don't trust me. I've felt like an outsider ever since.

Gibbs Depo., Ex. 31 at 1.

In a March 7, 2013 email to O'Neal, Plaintiff relayed that his "doctor ha[d] taken [him] off work for stress leave." Gibbs Depo., Ex. 35 at 1. Plaintiff explained that he "had to take time off" because he "just can't keep going like this and not seeing [his] kids" and stated that he had "been sick, depressed, kids are upset and cry each night, all this because of a vindictive person." *Id.* Plaintiff further stated that "[w]hen [Hawkins] was fired, [he] told [Siagan] about the sexual harassment and harassment and even showed her documentation. She did nothing, reported it to no one, instead she went to her friend, [Hawkins] and warned her [he] was complaining." *Id.* Plaintiff also complained that Siagan and then-Director of Finance, Andrew Field ("Field"), another one of his Plaintiff's superiors, "see people as objects not employees." *Id.*

After Plaintiff "made a number of complaints to [O'Neal] in February and March of 2013" O'Neal "reviewed them and spoke to Field to determine whether there was any merit to [Plaintiff's] claims." Doc. 11-4, Declaration of Nancy O'Neal ("O'Neal Decl.") at ¶ 3. "However, [O'Neal] was unable to substantiate any of [Plaintiff's] allegations." *Id.*

Sometime in early 2013, Kaplan changed multiple employees' schedules, including Plaintiff's, due to various scheduling and personnel issues within and outside of the CJ program. *See* UMF 78-84. Prior to these scheduling changes, Plaintiff worked the late shift, during which he closed the campus, one night per week while another employee, Bryan Morgan ("Morgan"[8]), close another night. UMF 79. Siagan and two other Program Directors closed the three remaining nights. UMF 79. However, Siagan left for maternity leave on April 14, 2013, Siagan Depo. at 71:14-15, and the two other Program

---

[8] Morgan initially was hired as a part-time Instructor. Siagan Depo. at 109:7. Siagan promoted him to full-time without Plaintiff's approval, *id.* at 109:8-15, which Plaintiff asserts was an effort to "undermine" him as a Program Director. *See* UMF 222.

1  Directors began to teach in the mornings and therefore were no longer available to close. UMF 82-83.

2  The CJ program, however, did not have morning programs. UMF 84. Because of these staffing issues,

3  on January 18, 2013, Siagan asked Plaintiff to continue closing on Wednesday nights and to close on

4  either Monday, Tuesday, or Thursday, while Morgan would close on the remaining two nights. UMF 24.

5  At some point, Plaintiff complained to O'Neal that Siagan's scheduling had not been "fair to him."

6  O'Neal Depo. at 58:12-13.

7       In March 2013, Plaintiff began a leave of absence under the California Family Rights Act

8  ("CFRA") and the Family Medical Leave Act ("FMLA"). UMF 86. On March 6, 2013, Plaintiff emailed

9  Siagan and Field to explain that he was being put on medical leave. Doc. 16-4, Ex. X, at 1. Field

10 forwarded Plaintiff's email to O'Neal on the same day, commenting that it was "Interesting timing. It's

11 also very abrupt." *Id.* Field testified that he found the timing to be "interesting" because it was "directly

12 after our accreditation visit, and it was right before [Plaintiff] had . . . a harder class schedule than he

13 was used to." Doc. 16-3, Ex. D, Deposition of Andrew Field ("Field Depo."), at 41:1-3. He considered

14 the leave to be "very abrupt" because "there was no indication whatsoever . . . that he was having

15 issues." *Id.* at 41:21-25.

16      On March 7, 2013, Plaintiff emailed O'Neal, explaining that his doctor had placed him on

17 medical leave. UMF 131. On April 4, 2013, Plaintiff emailed O'Neal to express concerns he was having

18 with Siagan and Field while he was on medical leave. UMF 35; Gibbs Depo., Ex. 36 at 1. He relayed

19 that he had been told by unidentified third-party individuals that, while he was on medical leave, Siagan

20 had "bad mouthed" him, had taken measurements of his office "as if she's going to move [him] out,

21 which caused staff to contact [him] to see if [he was] returning." Gibbs Depo., Ex. 36 at 1.[9] In Plaintiff's

22 view, Siagan "ha[d] set [him] up to fail since [Hawkins] ha[d] been gone and it's been nothing but

23 retaliation." *Id.* He further stated that he had "been in this mess for over a year, when does it stop." *Id.*

24 _____

25 [9] Defendants dispute these assertions, and Plaintiff has provided no evidence to support them, nor has he identified who
informed him of Siagan's and Field's alleged conduct while he was on medical leave. *See* UMF 87.

Less than an hour later, O'Neal responded: "I am off on vacation tomorrow and will not be back until the 16th [of April]. I've forwarded your message to my manager, Susan Bolon, who will follow up with you." *Id.*

Plaintiff complained to O'Neal that Siagan and Field met with CJ daytime students to discuss moving their classes to night while Plaintiff was out on medical leave. UMF 89, 244; O'Neal Depo. at 46:17-25. Siagan claims she and Field discussed the possibility with CJ students because "[t]he classes were getting smaller, so if they joined the night group . . . it would be more than one or two students. They would have actually students in the class to engage with." Siagan Depo. at 105:9-24. But after a majority of them indicated that it would not be feasible, the idea was abandoned. Field Depo. at 28:19-29:8. O'Neal discussed Plaintiff's complaint with Siagan and Field. O'Neal Depo. at 47:5-7.

Plaintiff initially was scheduled to return on April 1, 2013, but on April 4, 2013, Plaintiff's doctor extended his medical leave until April 15, 2013. UMF 132. Kaplan granted Plaintiff's leave extension and allowed him to stay on leave until his return to campus on April 15, 2013. UMF 133. Following his return on April 15, 2013, Kaplan accommodated Plaintiff by placing him on a reduced work schedule. UMF 134. He earned the same salary and benefits as before. UMF 93. On April 16, 2013, he requested and received a modification of his schedule so that he could transport his children. UMF 93. Kaplan agreed to further modify Plaintiff's schedule "so that he could spend more time with his family." UMF 94.

On May 17, 2013, then-Interim Operational Director Ramona Garcia ("Garcia") emailed O'Neal to discuss her recent meeting with Plaintiff at Kaplan's Fresno campus. Doc. 16-3, Ex. Y, at 1. Garcia stated that "[i]t feels like [Plaintiff] is trying to draw [her] into a web." *Id.* Garcia "was shocked when [Plaintiff] began sharing details with [her] about [his] sexual harassment case involving Allison Hawkins." *Id.* Plaintiff "mentioned to [Garcia] that it ha[d] been very difficult for him to move forward even though [Hawkins] was terminated as a result of this case." *Id.* He further stated that he did not trust Siagan because she and Hawkins were "best friends." *Id.* In Garcia's view, it was "obvious" that

9

1   Plaintiff "was throwing [Siagan] under the bus" and that he had been "careful to mention that he had

2   only returned from a leave a few [weeks] ago and that he was out on leave because of the stress of this

3   situation." *Id.*

4          On June 10, 2013, Field emailed O'Neal to "confirm and clarify" O'Neal's questions concerning

5   what he had gone over with Plaintiff during their one-on-one meetings. *See* Doc. 16-4, Ex. DD. Among

6   other things, Field stated: "I addressed [Plaintiff's] not playing well with others, that his program was

7   underperforming, that his kids shouldn't be at work, that I needed a regular schedule to rely on so I

8   could tell others when/where he was, etc." *Id.* at 1.

9          On June 11, 2013, the then-interim campus President, Field, issued Plaintiff a Formal Written

10   Warning ("the June Warning"). UMF 36; Gibbs Depo., Ex. 16 ("June Warning"). Field stated that,

11   "[a]lthough . . . we've made progress [he] still ha[d] several concerns that need[ed] to be addressed."

12   June Warning at 1. The three-page June Warning outlined the areas where Plaintiff's performance was

13   considered to be unsatisfactory, explained the potential effect of that unsatisfactory performance, and

14   provided a number of terms that Plaintiff had to agree to and satisfy. *Id.* at 1-3.

15          On June 14, 2013, Plaintiff submitted a response to his June Warning to O'Neal. UMF 38; Gibbs

16   Depo., Ex. 17. Plaintiff provided an explanation for a number of aspects of his performance deemed to

17   be unsatisfactory in the June Warning. *See generally* Gibbs Depo., Ex. 17. Plaintiff did not dispute that

18   the following problems with his performance were outlined in the June Warning:

19       (1) In January 2013, Plaintiff erroneously approved over 150 hours of overtime compensation for
20       one of his employees. Gibbs Depo. at 51:18-52:6.[10] "A similar issue arose in August 2012 with"
        another employee's timesheet." June Warning at 1.[11]

21       (2) Without prior notice, Plaintiff missed or came late to meetings on February 14, 2013,
        February 22, 2013, and May 28, 2013. *Id.*; UMF 97.[12]

22   _____

23   [10] Plaintiff explained that the 150-hour overpayment was due to a technical error. *See* Gibbs Depo., Ex. 17 at 1.

24   [11] Plaintiff claimed he "could [not] recall the specifics regarding [that employee's] timesheet." Gibbs Depo. at 52:11-2.
    [12] Plaintiff stated that he missed the meetings in February 2013 because he had been meeting with students, but "d[id] not
25   recall" missing the May 2013 meeting. Gibbs Depo. Ex. 17 at 1-2.

(3) Field asked Plaintiff on May 9, 2013 to organize a Campus Security Session, but he did not schedule one until June 24, 2013.[13] June Warning at 1; Doc. 16-5, Ex. LL at 2.

(4) Plaintiff did not timely submit a payroll analysis Field requested in April 2013.[14] *Id.*

(5) Plaintiff showed up an hour late on May 16, 2013, without excuse or explanation. *Id.* On May 24, 2013, Plaintiff left campus early without approval.[15]

(6) On June 4, 2013, Plaintiff was supposed to be on campus and could not be located. *Id.* Plaintiff acknowledged that he "did not update [coworkers about his whereabouts] when [he] should have." Doc. 16-5, Ex. LL at 2.

(7) The CJ program's year-to-date drop rate was below standards. June Warning at 2 ("YTD gross drop rate is 4.6%. Budget is 2.5%."); Doc. 16-5, Ex. LL at 13.

(8) The CJ program's year-to-date absence rate was below standards. June Warning at 2 ("YTD CJ absence rate is 17.23%; Doc. 16-5, Ex. LL at 13-14.

(9) The CJ program "missed placement benchmarks for the last three reporting years," during which Plaintiff was the Program Director. June Warning at 2; Doc. 16-5, Ex. LL at 13-14.[16]

Plaintiff acknowledged that, if he did not satisfy those agreed-upon terms, "further corrective action up to and including termination of employment" could occur. June Warning at 3.

On June 12, 2013, a day after receiving the June Warning, Plaintiff sent Field and O'Neal an email in which he explained that he had been on several medications and was "trying to work out memory and concentration issues." UMF 135. O'Neal responded to Plaintiff's email the next day, stating: "If you believe that you may need any accommodation under the [Americans with Disabilities Act ("ADA")], please let me know and we can work through the interactive process." Gibbs Depo., Ex. 42 at 1.

On June 13, 2014, Plaintiff submitted a response to his June Warning to O'Neal. *See* Doc. 16-4,

---

[13] Plaintiff claimed that he could not schedule the security session because it is normally presented by a CJ instructor whose schedule "ha[d] been very hectic" at the time. *Id.* at 2.

[14] Plaintiff explained that he had had the payroll analysis ready but "did not email it to [Field] which [he] should have." *Id.*
[15] Plaintiff stated that he had a family emergency on May 24 that required him to leave immediately but provided no explanation for his showing up late on May 16. *See id.*

[16] Plaintiff did not dispute the accuracy of the data contained in the June Warning concerning the CJ program's placement, retention, and absence rates. However, he claimed those rates were similar to those of other Kaplan campuses, and argued that subpar placement rates were due, in part, to Kaplan's career services. *See id.* at  10-14.

Ex. LL. Plaintiff provided a thorough explanation of why he believes the CJ program's retention and

absence rates were below standards and noted that they are similar to those of other Kaplan CJ

programs. *See id.* at 13-15. Plaintiff did not, however, dispute the veracity of the rates as outlined in the

June Warning, nor did he dispute that there were areas where he needed to show improvement. UMF

107.

On June 20, 2013, Plaintiff responded to O'Neal's June 13, 2013 email, stating, "as far as

accommodations are concerned just a little flexibility for now . . . .  Right now I'm running a little

behind because I've been dizzy most of the day." *Id.*; *see also* O'Neal Decl. at ¶ 9. Approximately an

hour later, O'Neal responded, providing an "accommodation request form" and explained:

> You will need to have your doctor fill out [the form] and we will review it . . . but not coming in
> on time and leaving early without advanced notice is not something that we can work with. Steve
> sent me an email where you indicate you forgot you had an engagement that would require you
> to leave early yesterday. Further, while you indicate you came in at 9, you neglected to send the
> email to [Field] until 3pm. Instead of a request to change your schedule, you basically said you
> were taking off at 6. Then today, when you are due in at 2, you send an email at 2:01 indicating
> that you will be late, and arrived at work at 2:45 . . . . This type of last minute notice – without a
> request in advance – is exactly the behavior your warning addressed. If you want to pursue the
> accommodation, please ensure that your doctor provides a request that reflects a specific,
> regularly recurring schedule that we can review to determine if we are able to accommodate this.

Gibbs Depo., Ex. 43 at 1; *see also* O'Neal Decl. at ¶ 9. Plaintiff never filled out the accommodation

request form. UMF 13; Gibbs Depo. at 180:10-181:5).[17] Plaintiff did not request further accommodation

other than his request for "a little flexibility," a modified schedule, and a leave of absence. UMF 140.

O'Neal reviewed the response to the June Warning "and looked into the issues raised by

[Plaintiff] therein but found that the performance issues in the [June Warning] were legitimate." O'Neal

Decl. at ¶ 10. On June 27, 2013, O'Neal emailed Plaintiff to explain that she had reviewed his response

and that she "wanted to provide additional feedback and a suggested plan to address the items [Plaintiff]

disagree[d] with." Gibbs Depo., Ex. 18, at 1. Among other things, O'Neal expressed her opinion that the

---

[17] In Bolon's view, Plaintiff "did not agree to go through the interactive reasonable accommodation process." Bolon Depo. at 44:20-21.

June Warning accurately reflected "concerns with [his] whereabouts during [his] scheduled work time, unexcused absences, missing meetings, etc." *Id.* Plaintiff responded less than an hour later stating, among other things: "I'll work on the work schedule stuff. It won't happen again if I can help it." *Id.*

In July 2013, Noha Elbaz ("Elbaz") became President of the Kaplan Fresno campus. UMF 42. She became Plaintiff's direct supervisor while Siagan was out on maternity leave. *See* O'Neal Depo. at 57:5-22. Field had informed her that Plaintiff had been performing poorly and Kaplan had been "working on his performance." Field Depo. at 16:9-25. Although O'Neal did not tell Plaintiff, Elbaz remained Plaintiff's supervisor when Siagan returned from maternity leave because of Plaintiff's "dissatisfaction and feelings about [Siagan]." *See* O'Neal Depo. at 57:20-58:6.[18]

On July 31, 2013, shortly after assuming her role as President, Elbaz emailed O'Neal to explain that she had had a one-on-one meeting with Plaintiff the day prior during which, in her view, "he came up with excuse after excuse for why the CJ program is struggling." Doc. 16-5, Ex. FF at 1. Elbaz stated that she was "still planning on putting together the next step in the process as we discussed yesterday." *Id.*; *see also* Elbaz Depo. at 68:8-69:12. Prior to July 31, 2013, Elbaz had discussed Plaintiff's performance issues with O'Neal and therefore was aware that Plaintiff had "been written up for not performing, and his performance was continuing to be below expectations." *Id.* at 68:22-24, 72:24-73:9. She had assessed his performance and met with him one-on-one to create a strategic performance plan to improve his performance. *See id.* at 72:12-73:25.

On July 31, 2013, Plaintiff responded to Elbaz's request by email, in which he provided a two-page timeline of Hawkins's alleged harassment and other associated complaints. Gibbs Depo., Ex. 38 at 1-2. Elbaz replied on August 1, 2013, stating that Plaintiff did not respond to his request for a strategic plan and asked that he do so by August 12, 2013. *Id.* at 1. Elbaz also explained that he would "reach out to [O'Neal] to confirm" that Plaintiff's allegations concerning Hawkins had been investigated by HR. *Id.*

---

[18] The record is unclear as to when Siagan returned from maternity leave. She left in mid-April and returned sometime before June 6, 2013, when Plaintiff received the Final Warning from her. *Id.*

13

1   Plaintiff immediately replied: "It has all been investigated….no need to, I don't want it brought up,

2   please." *Id.* Nonetheless, Elbaz forwarded Plaintiff's email to O'Neal as an "FYI." *Id.* By that time,

3   Elbaz had begun planning to write a final warning for Plaintiff because "there was no improvement in

4   his performance." Elbaz Depo at 73:5-9; UMF 288.

5       On August 5, 2013, Plaintiff informed Elbaz that he was applying to transfer to Kaplan

6   University. UMF 282; Doc. 11-8 at 1. O'Neal and Elbaz denied Plaintiff's request because Plaintiff was

7   "in a formal correction action process" due to the June Warning and, pursuant to Kaplan's employee

8   policies, employees who had received written warnings were not eligible for transfers. UMF 282-83;

9   Gibbs Depo. at 101:6-9; O'Neal Depo. at 52:19-53:10.

10      Because Plaintiff's performance did not improve in August, on August 27, 2013, Elbaz, with

11  O'Neal's input, issued Plaintiff a Final Written Warning ("the Final Warning"). UMF 47, 288; Gibbs

12  Depo., Ex 22 ("Final Warning"); Doc. 16-5, Ex. AAA at 1-2. Like the June Warning, the four-page

13  Final Warning outlined perceived issues with Plaintiff's performance, explained the problems those

14  issues caused, and explained the terms to which Plaintiff would agree going forward and the

15  consequences for his failing to satisfy those terms in the future. Final Warning at 1-4. Among other

16  things, the Final Warning documented that:

17      (1) The CJ program had a student pass rate of 88.2, whereas the average pass rate for CJ
        programs at other campuses was 91.5%. *Id.* at 2; UMF 114.

18

19      (2) The CJ program's year-to-date drop rate was 6.0% with a set goal of 2.5%. Final Warning at
        2; UMF 116.

20      (3) The CJ program's student absence rate was 18.9%, whereas it was lower at other campuses.
        Final Warning at 2; UMF 117.

21

22      (4) Plaintiff failed to accurately document students' attendance at a field trip, allowed them to
        arrive and leave at any time, and allowed "some students" to attend class instead of the field trip.
        Final Warning at 1; UMF 115.

23

24      (5) On August 13, 2013, Elbaz asked Plaintiff for "copies of all formal instructor observations
        that [Plaintiff] ha[d] conducted over the past 3 months," and Plaintiff responded that he had not
        conducted any. Final Warning at 1. Elbaz explained that "[e]ach instructor, at a minimum, is

25      required to have two formal observations per year," and that "waiting until the end of the year to

14

conduct both" or not doing them at all is unacceptable.  Final Warning at 2-3.

(6) "On multiple occasions," Elbaz had been "unable to find [Plaintiff] (via phone, email or searching for [him]) on campus at the beginning of the work day." Final Warning at 2.

(7) On August 16, 2013, Plaintiff could not be found when a student needed assistance around 10:30A.M., which was more than two hours after Plaintiff's scheduled arrival time. *Id.* When Plaintiff arrived, he had his daughter with him, which Elbaz considered "inappropriate." *Id.* at 2-3.[19]

(8) On August 26, 2013, Plaintiff failed to show up for a meeting with Elbaz on time. *Id.* After 20 minutes past the scheduled start time had elapsed, Elbaz called Plaintiff and told him to come to the meeting. *Id.*

(9) Plaintiff had not yet completed a second Campus Security Session and, although it was not due until four days later on September 1, 2013, Elbaz believed it was "unlikely" that Plaintiff would meet that deadline. Final Warning at 3.

Like the June Warning, in accepting the Final Warning, Plaintiff acknowledged that he understood that "[f]ailure to address the deficiencies noted [in the Final Warning] . . . and to meet performance and behavioral expectations may result in further corrective action up to and including termination of employment." *Id.* at 4.

Following the Final Warning, Elbaz met with Plaintiff on several occasions. UMF 118. She did so because she "wanted to help [Plaintiff] improve his performance." Doc. 11-3, Declaration of Noha Elbaz ("Elbaz Decl."), at ¶ 6.

In September 2013, after receiving the Final Warning, Plaintiff filed an initial charge of discrimination under FEHA against Kaplan with the California Department of Fair Employment and Housing ("DFEH"). UMF 64; Bolon Decl. at ¶ 5. Kaplan's in-house legal department looked into Plaintiff's DFEH charge. Bolon Decl. at ¶ 5. On September 25, 2013, Kaplan received correspondence from Plaintiff's counsel, requesting that Kaplan retain all "files or other data" related to Plaintiff. Gibbs

---

[19] In a series of emails on September 6, 2012, Field and O'Neal discussed Plaintiff's bringing his children to work and Kaplan's policy concerning employees bringing their children to work. Doc. 16-5, Ex. ZZ. Field asked for O'Neal's advice because Kaplan had "had individuals make comments about bring[ing] their own kids to work since [Plaintiff had] been doing it." *Id.* at 2. With regard to Kaplan's policy, O'Neal explained: "We do not have anything in writing, but it is not ok to bring your child to work." *Id.* at 2. O'Neal suggested that Field tell Plaintiff that Kaplan employees may bring their children to work for short periods of time if it was necessary, but that "having them [at work] all day is not appropriate." *Id.* at 1.

Depo., Ex. 44, at 1; UMF 66.

On October 24, 2013, Elbaz sent Plaintiff an email itemizing her continued concerns with Plaintiff's performance ("the October Warning"). Gibbs Depo., Ex. 27 ("October Warning"). Elbaz stated that she and Plaintiff had "had several discussions regarding concerns with the overall performance of [his] program as well as needed improvements with [his] leadership and behavior." *Id.* at 1. Elbaz, however, had "not seen any significant improvement," and found that Plaintiff's "behavior and outcomes, in many area, are worse than when we started." *Id.* Specifically, Elbaz indicated that "[t]he same issues continue to come up in regards to [Plaintiff's] program results, [his] administrative duties, punctuality, accountability and communication." *Id.* On four dates in September and October 2013, Plaintiff was 20-30 minutes late without informing a supervisor. *Id.* On multiple occasions, Plaintiff entirely failed to respond to co-workers' emails and requests for certain documents, or failed to do so in a timely manner. *See id.* at 1-2. Elbaz also noted that the year-to-date drop rate for the CJ program had increased from 6.0% in August to 6.3% and that the goal had remained at 2.5%. *Id.* Similarly, the CJ program had a year-to-date pass rate of 87.92% while CJ programs at other Kaplan campuses had an average of 91.28%. *Id.* "CJ [was] the only program on [the Fresno] campus to not meet accreditor benchmarks over the past 3 years." *Id.* Elbaz concluded: "Not only have you failed to address these concerns on your own, the issues remain even with the additional oversight and direction I have been providing to you. This cannot continue. You must address these issues immediately." *Id.* at 2. Elbaz did not indicate what consequences, if any, would result if Plaintiff failed to improve his performance. *See id.*

Plaintiff wrote a lengthy and detailed response to the October Warning. *See* Gibbs Depo., Ex. 23; UMF 51. Plaintiff stated that he did not "believe that the [Final] [W]arning was issued in an attempt to improve performance," but rather he believed "it was an attempt at a formality ultimately to be used as justification for [his] termination." Gibbs Depo., Ex. 23 at 1. Plaintiff further stated:

I have been harassed by people here in the past and present, I have been retaliated against and I

have been targeted. I have had my schedule from my kids taken, I have been bad mouthed to my staff, I have been unjustly written up, I have been accused of poor leadership when not one senior director has spoken to my staff, I have had resources taken away, I've been blamed for other department performance, I've had measurements and deadlines set for me that cannot be met with the threat of termination, my instructors are being chased away, senior management has obtained a job for my student who then needed to drop, senior management has told my students their classes are ending, I have been reassigned to instructor duties and my instructor reassigned to my duties, I have been told I can't use my instructor and I've been written up for not lowering an instructor's evaluation. There are many other things to mention but I'm exhausted and depressed from chasing my tail knowing that everything I'm doing will not save my job and from knowing that everything Kaplan is doing to fire me.

*Id.* at 10.

On November 3, 2013, Kaplan responded to Plaintiff's DFEH complaint. Doc. 16-3, Ex. P. Kaplan outlined its complaints with Plaintiff's performance. According to Kaplan, Plaintiff had "continually failed to meet his job responsibilities as Program Director, which has led to ongoing issues within the [CJ] program." *Id.* at 2. Kaplan asserted that, among other things, "the student absence rate for the program was 16.4 percent, the highest absence rate of any program at [Kaplan's Fresno campus]." *Id.* "As of October 2013, the absence rate was . . . 18.9%," and "there were 43 'F' grades in [CJ] program classes, amounting to 19.3% of all classes taken." *Id.* at 2-3. Further, the CJ program had "not met its placement rate requirement in three consecutive years (2010, 2011, 2012) and it appear[ed] that it w[ould] not meet its goal in 2013." *Id.* at 2.

On November 12, 2013, Elbaz left on maternity leave. UMF 54; Elbaz Decl. at ¶ 8. Before going on leave, Elbaz "recommended that [Plaintiff] be terminated based on his longstanding performance issues." *Id.* In her view, "[b]etween October 24, 2013, and when [she] made the recommendation, [she] did not perceive that [Plaintiff] had made significant improvements in his performance." *Id.* Elbaz testified that she was "not aware that [Plaintiff] had (allegedly) raised compliance issues with any of his supervisors" prior to deciding to issue Plaintiff the Final Warning and the October Warning or deciding to recommend that he be terminated. *Id.* at ¶ 9.

Garcia was interim President through December 2013 while Elbaz was on maternity leave. UMF 56. Doc. 11-7, Declaration of Ramona Garcia ("Garcia Decl."), at ¶ 2. Garcia had met Plaintiff on a few

occasions beginning in May 2013, but she had not interacted with him regularly before becoming

interim President. UMF 57. UMF 248. Garcia was aware that Elbaz had recommended that Plaintiff be

terminated. Garcia Decl. at ¶ 5. Garcia also had discussed with Field that Plaintiff had indicated that he

had taken "a stress leave because of a sex harassment complaint that he had made." Doc. 16-3, Ex. F,

Deposition of Ramona Garcia ("Garcia Depo.") at 21:1-2, 33:6-18.

During her tenure as interim President, Plaintiff "did not show any signs of improvement." *Id.*

Garcia "shared this information with O'Neal in or around November 2013 in connection with

discussions about terminating [Plaintiff's] employment." *Id.* at ¶ 6. After discussing terminating

Plaintiff's employment with Garcia, O'Neal "raised the issue . . . with Bolon, [her] supervisor." O'Neal

Decl. at ¶ 11. According to O'Neal, "[a]fter careful consideration, we decided to approve Elbaz's

recommendation to terminate [Plaintiff's] employment based on [his] longstanding performance

problems and failure to significantly improve." *Id.*

Bolon took part in the decision to terminate Plaintiff. Bolon Decl. at ¶ 4. Bolon confirmed that

she had "reviewed the facts supporting the decision to terminate [Plaintiff] and, ultimately, agreed that

termination was appropriate given [Plaintiff's] failure to significantly improve his performance and

attitude, despite being given several opportunities to do so over the preceding months." *Id.*; *see also*

UMF 515. Bolon was aware that Plaintiff had made "some allegations" concerning Kaplan's

"compliance." Bolon Depo. at 138:3-8; UMF 516. Elbaz, and Garcia, however, were unaware of those

allegations. Garcia Decl. at ¶ 6; Elbaz Decl. at ¶ 9; *see also* Doc. 16 at 24.

On December 3, 2013, O'Neal and Garcia met with Plaintiff in-person and informed him of the

decision to terminate his employment. UMF 63. Siagan was not involved in the decision, nor did she

ever recommend that Plaintiff be disciplined. Siagan Depo. at 14:22-15:14.

### III. PROCEDURAL HISTORY

On December 3, 2013, Plaintiff amended his DFEH charge to include a claim that he had been

retaliated against for complaining about harassment. UMF 67; Gibbs Depo., Ex. 46. On January 21,

1   2014, Plaintiff filed a complaint in the Superior Court of California for the County of Fresno. *See*

2   Compl. at 1. Kaplan removed the suit to this Court on February 24, 2014, on the basis of diversity of

3   citizenship. Doc. 1.

4

5   **A.   Plaintiff's Claims.**

6   Plaintiff brings claims for: (1) retaliation in violation of California Labor Code § 1102.5

7   ("Section 1102.5"); (2) retaliation in violation of California Labor Code § 923 ("Section 923"); (3)

8   retaliation in violation of California Government Code ("FEHA[20]") § 12940; (4) failure to prevent

9   discrimination and discrimination based on medical condition, disability and/or perceived disability in

10  violation of FEHA § 12940; (5) retaliation for exercising rights under CFRA, in violation of 2 California

11  Code of Regulations ("CCR") § 7297.7; and (6) wrongful termination in violation of public policy. *See*

12  Compl. at 11-17. Among other forms of relief, Plaintiff seeks punitive damages. *Id.* at 18.

13  Plaintiff's first cause of action alleges that he "complained about Kaplan supervisors engaging in

14  conduct that violated federal Department of Education academic accreditation regulations, including

15  falsely reporting job placement numbers of students and graduates." Compl. at ¶ 29. Plaintiff claims that

16  Kaplan "retaliated against [him] for complaining about Kaplan's unlawful conduct by subjecting him to

17  a hostile work environment and by terminating his employment." *Id.* at ¶ 30. Plaintiff asserts that

18  California "Labor Code § 1102.5 provides protection for whistleblowers such as Plaintiff." *Id.* at ¶ 28.

19  Plaintiff's second cause of action alleges that he "consulted an attorney to assist him in regard to

20  the terms and conditions of his employment when Defendant, Kaplan, discriminated against him,

21  retaliated against him, and threatened to discharge him," and actually terminated him when Kaplan

22  "learned that [he] had retained an attorney. *Id.* at ¶¶ 35-36. Plaintiff alleges this conduct violated

23  Section 923, which protects his right "to negotiate the terms and conditions of his employment." *Id.* at ¶

24

25  [20] "FEHA" stands for "Fair Employment and Housing Act," California Government Code §§ 12900 et seq.

35.

Plaintiff's third cause of action alleges that Kaplan "discriminated against him and discharged him from his employment in retaliation for his complaints about sex harassment and discrimination in the workplace." *Id.* at ¶ 43. Plaintiff asserts that "[t]hese acts were done in retaliation for his reports of and complaints about discrimination and sexual harassment and for filing a charge with the DFEH," in violation of FEHA § 12940. *Id.* at ¶¶ 41, 43.

Plaintiff's fourth cause of action alleges that Defendant "discriminated against and terminated [him] because of his medical condition and because it perceived him as disabled in addition to the fact that he might require medical attention, visits with doctors and absences from work." *Id.* at ¶ 49. Plaintiff claims that Kaplan and its agents subjected him to a hostile work environment, thereby depriving him of a discrimination-free work environment. *Id.* at ¶ 50. Further, Plaintiff claims that Kaplan "failed to prevent discrimination, failed to halt the offending conduct and failed to engage in a prompt and meaningful investigation of [his] complaints of discrimination and retaliation," in violation of California Government Code §§ 12900 et seq. *Id.* at ¶¶ 50-51.

Plaintiff's fifth cause of action alleges that Kaplan "retaliated against and discharged [him] . . . because he exercised his right to request and take medical leave to care for his serious medical condition," in violation of 2 CCR § 7297.2. *Id.* at ¶¶ 56-57.

Plaintiff's sixth cause of action alleges Kaplan discharged him for "among other things, because he complained about discrimination and harassment, because he filed a charge with DFEH, because [Kaplan] perceived him as disabled, because he took medical leave, and because he complained about illegal activity by [Kaplan]." *Id.* at ¶ 61. Plaintiff therefore claims that Kaplan wrongfully terminated him in violation of public policy. *Id.* at ¶ 60.

Plaintiff seeks, among other things, general damages, punitive damages, reinstatement to his job, and attorney's fees and costs. *Id.* at 13.

**B.    Kaplan's Motion for Summary Judgment.**

Kaplan moves for summary judgment on all of Plaintiff's claims on the ground they fail as a matter of law. Doc. 11-1 at 2-3. The parties agree that Plaintiff's claims properly are assessed under the three-part burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ("the *McDonnell Douglas* framework"). *See* Doc. 11-1 at 20, 23, 25, 27, 29 n.10, 30; Doc. 16 at 11 ("Plaintiff agrees that the three-stage McDonnell Douglas burden-shifting test applies."). The thrust of Kaplan's motion is that Kaplan's conduct was wholly lawful because (1) Kaplan did not retaliate or discriminate against Plaintiff in any way and (2) Kaplan terminated Plaintiff for legitimate, non-discriminatory reasons rooted in his long-standing performance problems.[21]

The thrust of Plaintiff's opposition, on the other hand, is that there exist numerous genuine issues of material fact concerning: (1) Kaplan's assertions that Plaintiff's performance and conduct were unsatisfactory; (2) whether Kaplan discriminated against him; (3) whether Kaplan retaliated against him; and (4) whether Kaplan wrongfully terminated him. *See* Doc. 16 at 30-31. Thus, Plaintiff asserts that Kaplan is not entitled to summary judgment on any of his claims. *Id.*

## IV. <u>STANDARD OF DECISION</u>

Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that may affect the outcome of the case under the applicable law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable trier of fact could return a verdict in favor of the nonmoving party." *Id.*

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions,

---

[21] With regard to Plaintiff's second cause of action brought under California Labor Code § 923, Kaplan maintains that "by its plain language, Section 923 does not create a stand-alone cause of action." *Id.* at 29. Kaplan further argues that, even if it did so, "it would still fail for the same reasons" why his sixth cause of action fails. *Id.* at 29 n.26.

answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). The exact nature of this responsibility, however, varies depending on whether the issue on which summary judgment is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *Cecala v. Newman*, 532 F. Supp. 2d 1118, 1132 (D. Ariz. 2007). If the movant will have the burden of proof at trial, it must demonstrate, with affirmative evidence, that "no reasonable trier of fact could find other than for the moving party." *Soremekun*, 509 F.3d at 984. In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Id.* (citing *Celotex*, 477 U.S. at 323).

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting *affirmative evidence* from which a jury could find in [its] favor." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis in original). "[B]ald assertions or a mere scintilla of evidence" will not suffice in this regard. *Id.* at 929; *see also Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (citation omitted). "Where the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence." *Soremekun*, 509 F.3d at 984. That remains the province of the jury or fact finder. *See Anderson*, 477 U.S. at 255. Instead, "[t]he evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* Inferences, however, are not

drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).

# V. ANALYSIS

**A.**    ***McDonnell Douglas*.**

As noted, the parties agree that Plaintiff's claims are properly assessed under the three-part *McDonnell Douglas* framework. *See supra* at 20. Under the *McDonnell Douglas* test,

(1) the plaintiff must establish a prima facie case of discrimination[22]; (2) if the plaintiff is successful, the employer must offer a legitimate nondiscriminatory reason for its actions; and (3) if the employer produces evidence on that point, the plaintiff must show that employer's reason was a pretext for discrimination.

*Trop v. Sony Pictures Entertainment, Inc.*, 129 Cal. App. 4th 1133, 1144 (2005) (citing *Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317, 354 (2000); *Morgan v. Regents of University of California*, 88 Cal. App. 4th 52, 67-68 (2000)).

An employee may satisfy his or her burden under the *McDonnell Douglas* test with direct or circumstantial evidence. *See id.* "Direct evidence is evidence which proves a fact without inference or presumption." *Id.* (citation omitted).

The California Supreme Court has noted that "the great weight of federal and California authority holds that an employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory." *Id.* at 361 (footnote omitted). Accordingly, in the context of an employer's summary judgment motion, "the employer satisfies its burden as moving party if it presents evidence of such nondiscriminatory reasons that would permit a trier of fact to find, more

---

[22] The Court agrees with the parties that the *McDonnell Douglas* framework applies to all of Plaintiff's claims, including his claims of retaliation and unlawful termination. *See Middlekauff v. Hearts Corp.*, No. 2:12-cv-01356-KJM-DAD, 2014 WL 1389760, at *4 (E.D. Cal. Apr. 4, 2014) (collecting cases); *Anderson v. CRST Intern., Inc.*, No. 14-cv-368 DSF (MANx), 2015 WL 1487074, at *8 (C.D. Cal. Apr. 1, 2015).

1  likely than not, that they were the basis for the termination." *Kelly v. Stamps.com, Inc.*, 135 Cal. App.

2  4th 1088, 1097-98 (2005).

3     "To defeat the motion, the employee then must adduce or point to evidence raising a triable

4  issue, that would permit a trier of fact to find by a preponderance that intentional discrimination

5  occurred." *Id.* Ultimately, "[t]he central issue is and should remain whether the evidence as a whole

6  supports a reasoned inference that the challenged action was the product of discriminatory or retaliatory

7  animus," *Mamou v. Trendwest Resorts, Inc.*, 165 Cal. App. 4th 686, 715 (2008), and "[t]he ultimate

8  burden of persuasion on the issue of discrimination remains with the plaintiff." *Harris v. City of Santa*

9  *Monica*, 56 Cal.4th 203, 215 (2013). Accordingly, summary judgment may be granted where "the

10  plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was

11  abundant and uncontroverted independent evidence that no discrimination had occurred." *Guz*, 24

12  Cal.4th at 362.

13  **B.     Summary of Kaplan's Reasons for Its Decisions Concerning Plaintiff.**

14     Kaplan's numerous arguments in support of its motion for summary judgment boil down to its

15  assertion that all of its interactions with and decisions regarding Plaintiff were lawful because they were

16  driven entirely by a legitimate, non-discriminatory reason: Plaintiff's "persistent and unabated

17  performance problems." Doc. 11-1 at 22. The Court has thoroughly reviewed the record and has

18  determined that, among other things, the evidence establishes (and Plaintiff admits or does not dispute)

19  that:

20  - The CJ program's absence rates, drop rates, pass rates, and job placement rates were substandard

21    in 2011, 2012, and 2013, pursuant to Kaplan's corporate-set expectations.

22  - Plaintiff arrived late and left early without notice or approval on numerous occasions.

23  - Plaintiff made mistakes concerning his employees' compensation.

24  - Plaintiff missed a number of meetings and deadlines, oftentimes by multiple weeks or months.

25  - Plaintiff was warned by Siagan, Field, O'Neal, Garcia, and Elbaz over the course of 2012 and

2013 that his performance was unsatisfactory and needed improvement, but none of them found that his performance improved prior to his termination.

For these reasons, the Court finds that the undisputed evidence demonstrates Kaplan had legitimate, non-discriminatory reasons to discipline and terminate Plaintiff. Kaplan therefore has met its burden under the second prong of the *McDonnell Douglas* framework on all of Plaintiff's causes of action, as discussed in more detail below.

**C.     Plaintiff's First Cause of Action.**

Plaintiff's first cause of action is brought under Section 1102.5, which is known as "California's general whistleblower statute." *Carter v. Escondido Union High School Dist.*, 148 Cal. App. 4th 922, 933 (2007); Compl. at ¶ 28 ("Labor Code § 1102.5 provides protection for whistleblowers such as Plaintiff."). "This provision reflects the broad public policy interest in encouraging workplace whistle-blowers to report unlawful acts without fearing retaliation." *Green v. Ralee Engineering Co.*, 19 Cal.4th 66, 77 (1998).

"To establish a prima facie case of retaliation [under Section 1102.5], the plaintiff 'must show (1) she engaged in a protected activity, (2) her employer subjected her to an adverse employment action, and (3) there is a causal link between the two.'" *McVeigh v. Recology San Francisco*, 213 Cal. App. 4th 443, 465 (2013) (quoting *Patten v. Grant Joint Union High School Dist.*, 134 Cal. App. 4th 1378, 1385-86 (2005)). Kaplan asserts that Plaintiff cannot establish a prima facie case of retaliation under Section 1102.5 because (1) his alleged compliance complaints were not understood to be complaints about unlawful conduct and (2) neither Garcia nor Elbaz were aware that Plaintiff had made any such complaints. Doc. 11-1 at 28. Kaplan argues that, even if Plaintiff could establish a prima facie case of retaliation, Kaplan "had legitimate non-retaliatory reasons for all of its actions and [Plaintiff] has no evidence of pretext." *Id.* (emphasis omitted).

Plaintiff argues that he has established a prima facie case of retaliation because he complained about Kaplan supervisors allegedly engaging in conduct that violated federal "academic accreditation

regulations, including falsely reporting job placement numbers of students and graduates" and, in response, Kaplan "retaliated against [him] . . . by subjecting him to a hostile work environment and by terminating his employment." Compl. at ¶¶ 28, 30; Doc. 16 at 24. Plaintiff acknowledges that neither Garcia nor Elbaz were aware of his alleged compliance complaints, but he asserts that Bolon, who was involved with and agreed with the decision to terminate his employment, was aware of those complaints. Doc. 16 at 24.

Even if Plaintiff has satisfied his prima facie burden, Kaplan has met its burden of articulating a legitimate, non-discriminatory reason for terminating him, and Plaintiff has proffered no evidence of pretext. Garcia and Elbaz consistently testified in their depositions and declarations that Plaintiff had numerous long-standing performance problems, according to their perceptions of Plaintiff's performance and those of other Kaplan employees (*e.g.*, O'Neal, Siagan, and Field). Based on those well-documented issues with his performance, Garcia and Elbaz recommended that Plaintiff be terminated. And (as Plaintiff acknowledges) neither of them had any knowledge that he had made alleged compliance complaints, much less made their termination recommendations due to those complaints.

Plaintiff provides no argument in response to Kaplan's assertion that it terminated Plaintiff for legitimate, non-discriminatory reasons and that Plaintiff has no evidence of pretext.[23] *See* Doc. 16 at 24. Further, Plaintiff provides no argument concerning his allegation in the Complaint that Kaplan retaliated against him in the form of subjecting him to a hostile work environment. *See id.*

Plaintiff has proffered no argument or evidence of pretext concerning Garcia.[24] *See id.* Plaintiff argues (in the context of another cause of action), however, that Elbaz's stated reasons for terminating Plaintiff were pretextual because she "talked about disciplining [Plaintiff] before he did anything

---

[23] Plaintiff has done so in response to Kaplan's motion for summary judgment on Plaintiff's other claims. Because Plaintiff's claims are closely interrelated, the Court will consider those arguments here, where applicable.

[24] As discussed below, Plaintiff has proffered evidence of pretext concerning other Kaplan employees in the context of other causes of action.

1   wrong." *Id.* at 19. Plaintiff claims that, although Elbaz began at Kaplan on July 8, 2013, and there are no

2   documented issues with Plaintiff's performance between then and August 6, 2013, Elbaz discussed

3   disciplining Plaintiff on July 31, 2013, even though he "had not done any of the things mentioned in the

4   August 27, 2013, Final Written Warning." *Id.*

5        Plaintiff's argument completely misses the mark. Plaintiff essentially suggests that Elbaz had no

6   reason to consider disciplining Plaintiff by July 31, 2013. But, as she testified, by the time she met with

7   Plaintiff on July 30, 2013, she already had discussed his past performance problems and disciplinary

8   history with O'Neal. In fact, her stated purpose of their July 31, 2013 one-on-one meeting was to create

9   a plan to improve Plaintiff's performance because she had independently assessed his performance and

10  determined it needed improvement, and was aware that other Kaplan employees agreed. Further, she had

11  perceived no improvement in his performance in the almost month since she had assumed her new role

12  on July 8, 2013.

13       In summary, Kaplan has met its burden under *McDonnell Douglas* of demonstrating that it had

14  legitimate, non-discriminatory reasons for terminating Plaintiff, which were wholly unrelated to his

15  alleged compliance complaints. Plaintiff, on the other hand, has failed to meet his burden of producing

16  evidence of pretext sufficient to rebut Kaplan's lawful reasons for terminating him. In fact, Plaintiff

17  testified that none of his supervisors referenced his compliance complaints when disciplining or

18  terminating him. *See* Gibbs Depo. at 196:9-22.[25] Here, there is "abundant and uncontroverted" evidence

19  of Kaplan's legitimate, non-discriminatory reasons for terminating Plaintiff, and Plaintiff has not even

20  "created . . . a weak issue of fact as to whether the employer's reason was untrue." *Guz*, 24 Cal. 4th at

21

22  [25] The Court need not address Plaintiff's assertion that Bolon's knowledge of Plaintiff's alleged compliance complaints is
    sufficient, without more, to establish a prima facie case of retaliation. Even assuming it is, Kaplan has met its burden of
    articulating a legitimate, non-discriminatory reason for terminating him, and Plaintiff has proffered no evidence of pretext.
23  Bolon testified that she knew Plaintiff had made "some allegations" concerning compliance, but she did not indicate when
    she became aware of Plaintiff's compliance complaints nor that she understood them with any specificity. *See* Bolon Depo. at
    137:14-138:8. Even assuming Bolon became aware of Plaintiff's compliance complaints shortly before she agreed with the
24  decision to terminate him "temporal proximity alone is not sufficient to raise a triable issue as to pretext once the employer
    has offered evidence of a legitimate, nondiscriminatory reason for the termination." *Arteaga v. Brink's, Inc.*, 163 Cal. App.
25  4th 327, 353 (2008).

1   362. Accordingly, the Court GRANTS Kaplan's motion for summary judgment on Plaintiff's first cause

2   of action in Kaplan's favor and against Plaintiff.

3   **D.      Plaintiff's Second Cause of Action.**

4          Plaintiff's second cause of action is brought under Section 923, the purpose of which "is to

5   guarantee to individual employees full freedom of self-organization and of association with others 'for

6   the purpose of collective bargaining or other mutual aid or protection,' free from interference or

7   coercion by their employers." *Petri Cleaners, Inc. v. Automotive Employees etc. Local No. 88*, 53 Cal.2d

8   455 (1960) (emphasis and citation omitted). "Section 923 codifies the state public policy and was

9   intended 'to balance the industrial equation, so far as it is possible to do so, by placing employer and

10  employee on an equal basis.'" *Serv. Employees Int'l Union v. Hollywood Park, Inc.*, 149 Cal. App. 3d

11  745, 759 (1983) (citation and quotation marks omitted).

12         Kaplan asserts that statute "does not create a stand-alone cause of action," and that "the proper

13  vehicle for raising a claim pursuant to Section 923 is through a so-called *Tameny*[26] claim—*i.e.*,

14  [Plaintiff's] Sixth Cause of Action." Doc. 11-1 at 29. Thus, Kaplan asserts Plaintiff's second cause of

15  action fails "because Section 923 does not—*in and of itself*—create a new source of relief." *Id.* at 30

16  (emphasis in original). Kaplan contends, however, that "[e]ven if [Section 923] were a stand-alone

17  claim, it would fail for the same reasons as [Plaintiff's] derivative Sixth Cause of Action." *Id.* at 29 n.26.

18         Plaintiff argues that California Labor Code Section 2698 confers onto any aggrieved employee a

19  private right of action for any Labor Code section violation, including Section 293. *See* Doc. 16 at 25-

20  26. Plaintiff further asserts that there are triable issues of fact as to whether Kaplan's stated reasons for

21  disciplining and terminating Plaintiff "are pretextual or unworthy of credence." *Id.* at 26. Kaplan does

22  not address Plaintiff's arguments in its reply.

23         The Court need not resolve the issue of whether Section 923 creates a stand-alone cause of

24  _____

25  [26] A *Tameny* claim essentially is a claim for wrongful termination in violation of public policy. *See Silguero v. Creteguard, Inc.*, 187 Cal. App. 4th 60, 66-67 (2010).

28

1   action. Even assuming that it does, Plaintiff's claim that he was terminated because he retained an

2   attorney to negotiate the terms and conditions of his employment is not supported. For the reasons

3   discussed above, Kaplan has established that it had legitimate, non-discriminatory reasons for

4   terminating Plaintiff. Plaintiff, however, provides no argument to support a showing that the proffered

5   reasons were pretext for terminating him due to his retaining an attorney, aside from pointing out that he

6   was fired over two months after Kaplan was informed in late September 2013 that Plaintiff had retained

7   counsel (which was almost four months after he received the June Warning).

8        Temporal proximity, without more, is insufficient to create a genuine issue of material fact as to

9   whether Kaplan's stated reasons for disciplining and terminating Plaintiff were pretextual. *Arteaga v.*

10  *Brink's, Inc.*, 163 Cal. App. 4th 327, 353 (2008) ("[T]emporal proximity alone is not sufficient to raise a

11  triable issue as to pretext once the employer has offered evidence of a legitimate, nondiscriminatory

12  reason for the termination").[27] Plaintiff had long-standing performance problems prior to September

13  2013, when he retained counsel, and those problems persisted in the ensuing months. Plaintiff has not

14  rebutted this "abundant and uncontroverted" evidence of Kaplan's legitimate, non-discriminatory

15  reasons for disciplining and terminating him. Accordingly, the Court GRANTS Kaplan's motion for

16  summary judgment on Plaintiff's second cause of action in Kaplan's favor and against Plaintiff.

17  **E.    Plaintiff's Third Cause of Action.**

18        Plaintiff's third cause of action is brought under FEHA § 12940(f), which prohibits an employer

19  from discriminating or retaliating against an employee for filing a claim brought under FEHA. *See*

20  FEHA § 12940(f). Plaintiff alleges that Kaplan and its employees retaliated against and terminated him

21  ─────────────────────

22  [27] California's refusal to accept temporal proximity as sufficient support, on its own, for a showing of pretext in the context of
     California discrimination claims is to be distinguished from Ninth Circuit authority, which does, under some circumstances,
23   permit temporal proximity to demonstrate pretext in connection with federal discrimination claims. *See, e.g.*, *Bell v.*
     *Clackamas County*, 341 F.3d 858, 865 (9th Cir. 2003) (finding sufficient evidence to support federal retaliation claim where
24   low performance reviews immediately followed plaintiff's complaints); *Johnson v. United Cerebral Palsy/Spastic Children's*
     *Found. of Los Angeles & Ventura Counties*, 173 Cal. App. 4th 740, 757 n.10  (2009) (explaining distinction between Ninth
     Circuit and California authority on this issue).

25

1    due to his complaints about sex harassment and discrimination and for his filing a claim with the DFEH.

2    To establish a prima facie claim under § 12940(f), Plaintiff must show that (1) he engaged in a protected

3    activity; (2) he suffered an adverse employment action; and (3) there is a causal link between the

4    protected activity and the adverse employment action. *See Chen v. Cnty. of Orange*, 96 Cal. App. 4th

5    926, 949 (2002).

6           As discussed above, Kaplan has established that it had legitimate, non-discriminatory reasons for

7    disciplining and terminating Plaintiff. As such, Kaplan is entitled to summary judgment unless Plaintiff

8    demonstrates those reasons were pretextual.

9           Plaintiff raises a number of arguments in opposition to Kaplan's motion for summary judgment

10   on his third cause of action. Because Plaintiff's opposition is not a model of clarity, it is not entirely

11   clear which arguments are proffered in support of which aspect of the *McDonnell Douglas* framework as

12   applied to his third cause of action.

13          For instance, Plaintiff provides only two brief arguments that he explicitly offers to support his

14   claim that Kaplan's stated reasons for its disciplining and terminating him are pretextual. *See* Doc. 16 at

15   19-20, 24. The first, which concerns Elbaz's allegedly discussing and agreeing to terminate Plaintiff

16   before he had "done anything wrong," has no merit, as discussed above. *See supra* at 27; Doc. 16 at 19.

17   In the second, Plaintiff claims that Siagan's "not want[ing] to work with [Plaintiff] shortly after she was

18   given a final written warning for failing to report [Plaintiff's] sex harassment complaint and telling

19   [Hawkins]" about it is "direct evidence of pretext." Doc. 16 at 24 (citing UMF 200). The Court

20   disagrees. Direct evidence proves the fact of discriminatory animus without inference or presumption.

21   *Trop*, 129 Cal. App. 4th at 1144. Siagan's statements about not wanting to work with Plaintiff, if true, do

22   not necessarily demonstrate she harbored discriminatory animus toward Plaintiff. Rather, those

23   statements simply indicate that Siagan had communication problems with Plaintiff and she was

24   concerned that Plaintiff would attempt to get her in trouble at work given their workplace history and

25   Plaintiff's complaints against Hawkins. At best, Siagan's comments constitute circumstantial evidence

1   that Siagan was thinking about Plaintiff's past sexual harassment complaint. This, however, amounts to

2   just the kind of "weak issue of fact" warned against in *Guz*, 24 Cal.4th at 362, which fails to create a

3   triable issue with respect to whether Kaplan's actions were driven by a retaliatory or discriminatory

4   motive.

5          Plaintiff claims he can prove that that Kaplan's proffered legitimate, non-discriminatory reasons

6   for disciplining and terminating terminating him were pretextual and unworthy of credence because he

7   "can show many . . . weaknesses, implausibilies, inconsistencies, incoherencies, or contradictions" in

8   [Kaplan's] proffered legitimate reasons." Doc. 16 at 22. In a scattershot approach, Plaintiff lists a series

9   of events and facts that he appears to suggest demonstrates pretext. *See id.* at 19-24. Plaintiff's proffered

10  evidence of pretext is summarized as follows:

11  • Plaintiff received positive performance reviews before and after he complained of sexual

12     harassment in 2011. *Id.* at 19, 21.

13  • The CJ program at the Fresno campus was the best performing CJ program in Northern

14     California. Plaintiff's managers used misguided analyses of his CJ program and others to

15     conclude Plaintiff was performing unsatisfactorily. *Id.* at 20-21.

16  • Plaintiff's "managers exaggerated minor misconduct about missed meetings, time cards, help

17     with audits, problems with career services, scheduling a security event, having kids at work, a

18     field trip sign-in, work schedules and late evaluations." *Id.* at 21.

19  • There are inconsistencies and ambiguities in the deposition testimony of Plaintiff's superiors. *Id.*

20     at 22-23.[28]

21          That Plaintiff's performance was satisfactory at times and in some respects is not dispositive.

22  The bulk of the evidence Plaintiff cites to demonstrate his performance was satisfactory (namely, emails,

23  *see* Doc. 16-5, Exs. FFF-QQQ) is from 2011 and 2012; the most recent is from February 2013. Doc. 16-

24  _____

25  [28] Plaintiff also refers to a number of facts drawn from his superiors' deposition testimony that have no bearing on whether Kaplan's reasons for disciplining and terminating Plaintiff were pretext. *See* Doc. 16 at 22-23.

1  5, Ex. QQQ. Many of those emails are directed are a number of employees, not just Plaintiff,

2  commending the group's overall success. *See, e.g.*, Doc. 16-5, Exs. FFF, GGG, HHH, NNN, OOO,

3  QQQ. In other words, this evidence does not undermine Kaplan's assertion that Plaintiff's multiple

4  superiors believed that Plaintiff's *overall* performance degraded, became unsatisfactory in early 2013,

5  and remained unsatisfactory through his termination in December 2013.

6       Plaintiff does not dispute that, according to multiple objective metrics, his CJ program was

7  underperforming—for years—pursuant to Kaplan's corporate-set standards. That Plaintiff's superiors'

8  assessment of his performance may have been misguided or faulty is not evidence of pretext. Plaintiff

9  cannot establish that Kaplan's proffered legitimate, non-discriminatory reasons for disciplining and

10  terminating Plaintiff is pretextual by showing that Kaplan's "decision was wrong, mistaken, or unwise."

11  *Horn v. Cushman & Wakefield Western, Inc.*, 72 Cal. App. 4th 798, 807 (1999); *Guz*, 24 Cal.4th at 358

12  ("[i]f nondiscriminatory, [an employer's] true reasons need not necessarily have been wise or correct").

13  Similarly, Kaplan need not show that its reasons for disciplining and terminating Plaintiff were fair, but

14  only must show that its decisions were not "based on a prohibited reason." *Loggins v. Kaiser*

15  *Permanente Intern.*, 151 Cal. App. 4th 1102, 1111 n.7 (2007). It is not sufficient for Plaintiff to show

16  that the reasons underlying Kaplan's decisions were "exaggerated" or even "objectively false." *See*

17  *Villiarimo*, 281 F.3d at 1063.

18       Plaintiff's argument that his superiors' testimony was somehow inconsistent, incoherent, or

19  contradicted lacks merit. All of Plaintiff's superiors consistently testified in their depositions and

20  declarations that Plaintiff' long-standing performance issues, which were well-documented and well-

21  known to each of them, were the reason he was disciplined and terminated. Plaintiff has presented no

22  evidence that suggests any of his superiors did not honestly believe their assessment of his performance

23  and their proffered reasons for disciplining and terminating him were valid.

24       Simply stated, Kaplan has met its burden under *McDonnell Douglas* and Plaintiff has failed to

25  meet his burden of demonstrating pretext. Accordingly, the Court GRANTS Kaplan's motion for

1   summary judgment on Plaintiff's third cause of action in Kaplan's favor and against Plaintiff.

2   **F.   Plaintiff's Fourth Cause of Action.**

3   Plaintiff's fourth cause of action is brought under FEHA § 12940, which provides that it is

4   unlawful for an employer to discriminate against an employee on the basis of his or her medical

5   condition or disability. To establish a prima facie case of disability- or medical condition-based

6   discrimination, Plaintiff must establish that (1) he suffered from an actual or perceived disability; (2) he

7   could perform the duties of his position with or without reasonable accommodation; and (3) that he was

8   subjected to an adverse employment action because of his disability. *See Jensen v. Wells Fargo Bank*, 85

9   Cal. App. 4th 245, 254 (2000).

10   Plaintiff alleges that Kaplan "discriminated against and terminated Plaintiff because of his

11   medical condition and because it perceived him as disabled in addition to the fact that he might require

12   medical attention, visits with doctors and absences from work." Compl. at ¶ 49. Further, Plaintiff alleges

13   that Kaplan "failed to prevent discrimination, failed to halt the offending conduct, and failed to engage

14   in a prompt and meaningful investigation of Plaintiff's complaints of discrimination and retaliation." *Id.*

15   at ¶ 51.

16   Plaintiff clarifies in his opposition that he "was wrongfully told that he could not have an

17   accommodation unless he met the requirements of the ADA" because Kaplan requires its employees "to

18   fill out ADA forms if they wanted an accommodation." Doc. 16 at 27.[29] Plaintiff claims that he informed

19   Bolon that "he was uncomfortable talking about his medication in front of [his supervisor] Sablan and

20   worried about repercussions if he went through the request for accommodation regarding the effects of

21   medication." *Id.* Further, Plaintiff contends that, even though she was supposed to, O'Neal failed to

22   discuss these issues with Plaintiff and "never told [him] what the interactive process was when he asked

23   for an accommodation regarding his medication." *Id.*

24   _____

25   [29] In the context of his fifth cause of action, Plaintiff asserts that "O'Neal wrongfully told [Plaintiff] that he could not have an accommodation unless he met the requirements of the ADA, when [he] was only required to meet the much less stringent requirements of FEHA." Doc. 16 at 26.

1        There is no evidence of disability-based discrimination nor is there any evidence that Kaplan

2   treated Plaintiff differently in any way because of a perceived disability. Plaintiff's suggestion that

3   Kaplan refused to accommodate him only if he qualified for accommodation under the ADA, as opposed

4   to FEHA, is unsupported. In June 2013, when O'Neal asked Plaintiff what kind of accommodation he

5   may need, he only requested "just a little flexibility for now." In response, O'Neal asked Plaintiff to

6   provide him with medical documentation of his medical needs so Kaplan could assess his

7   accommodation needs, and it is undisputed that Plaintiff never did so. *See* Gibbs Depo. at 181:1-5. With

8   regard to requesting an accommodation for his medication, O'Neal was unaware that Plaintiff was

9   uncomfortable discussing his medication in front of Sablan; she thought he was uncomfortable

10  discussing it in front of another Kaplan employee. *See* O'Neal Depo. at 63:8-14. Further, and more

11  importantly, Plaintiff only requested an accommodation for "a little flexibility." There is no evidence

12  that he asked O'Neal for an accommodation concerning his medication.

13       Simply put, there is no evidence that Kaplan discriminated or retaliated against Plaintiff in any

14  way due to a disability. As discussed above, Kaplan had legitimate, non-discriminatory reasons for

15  disciplining and terminating Plaintiff and, again, Plaintiff has provided no evidence that those reasons

16  were pretextual. Because there was no disability-based discrimination or retaliation against Plaintiff (as

17  discussed in more detail above and below), Plaintiff necessarily cannot establish that Kaplan failed to

18  prevent discrimination against him. Accordingly, the Court GRANTS Kaplan's motion for summary

19  judgment on Plaintiff's fourth cause of action in Kaplan's favor and against Plaintiff.

20  **G.**     **Plaintiff's Fifth Cause of Action.**

21       Plaintiff's fifth cause of action is brought under 2 C.C.R. § 7297.7, which prohibits an employer

22  from retaliating or discriminating against an employee for exercising his or her rights to taking leave

23  under CFRA. To establish a prima facie case of a violation of 2 C.C.R. § 7297.7, Plaintiff must show

24  that "(1) [Kaplan] was an employer covered by CFRA; (2) [he] was an employee eligible to take CFRA

25  leave; (3) [he] exercised h[is] right to take leave for a qualifying CFRA purpose; and (4) [he] suffered an

1  adverse employment action, such as termination, fine, or suspension, because of h[is] exercise of h[is]

2  right to CFRA leave." *Dudley v. Dep't of Transp.*, 90 Cal. App. 4th 255, 261 (2001).

3          Plaintiff alleges that Kaplan "retaliated against and discharged [him] from his employment

4  because he exercised his right to request and take medical leave to care for his serious medical

5  condition." Compl. at ¶ 57. Plaintiff argues that he was disciplined because he took medical leave. In

6  support, Plaintiff points to the "adverse treatment and action leading up to the [Final Warning]," which

7  was issued in August 2013, approximately four months after he returned from medical leave in mid-

8  April 2013. *See* Doc. 16 at 26. Specifically, Plaintiff argues that, because he took medical leave (1) Field

9  and Siagan "caused problems for the CJ program during [his] medical leave"; (2) Field disciplined him

10  approximately a month after his return; (3) Field recommended further discipline to Elbaz

11  approximately two months after his return; (4) Elbaz denied Plaintiff's transfer request; (5) Elbaz

12  "talked about terminating [Plaintiff] . . . even though [Plaintiff] had not done anything wrong; and (6)

13  Elbaz disciplined Plaintiff four months after his return. *Id.*

14          As discussed above, Field and Elbaz had legitimate, non-discriminatory reasons for disciplining

15  Plaintiff. There is no evidence that they disciplined Plaintiff due to his medical leave. Similarly, there is

16  no evidence that Elbaz denied Plaintiff's transfer request because of his medical leave; it was denied

17  pursuant to Kaplan's policy that prohibits transfer when an employee is formally disciplined, as Plaintiff

18  was with the June Warning.

19          With regard to Plaintiff's assertion that Field and Siagan "caused problems for the CJ program

20  during [Plaintiff's] medical leave," Plaintiff seemingly is referring to their promoting inquiring with

21  daytime CJ students whether they would prefer changing to nighttime classes while Plaintiff was on

22  leave and Siagan allegedly "badmouthing" him. *See* Doc. 16 at 26 (citing UMF 241-43). There is no

23  evidence that Field and Siagan spoke to the daytime CJ students in retaliation to Plaintiff's taking

24  medical leave. Rather, both Field and Siagan believed that these changes would benefit the CJ program

25  and its students due to the small afternoon class sizes. *See* UMF 241. Concerning Siagan's alleged

1   "badmouthing" of Plaintiff, there is no evidence beyond Plaintiff's unsupported assertions that he had

2   heard from undisclosed third-party Kaplan employees that Siagan had "badmouthed" him while he was

3   out on leave.

4          In any event, Kaplan had legitimate, non-discriminatory reasons for disciplining and terminating

5   Plaintiff, and Plaintiff has no evidence that they were pretextual. There is no evidence that Kaplan

6   disciplined and terminated Plaintiff *because* he took medical leave. Plaintiff's only proposed evidence

7   that Kaplan's reasons for disciplining and terminating him were pretextual is Field's comment in a

8   March 6, 2013 email to O'Neal that the timing of Plaintiff's medical leave was "interesting" and

9   "abrupt." Plaintiff claims that Field "was annoyed . . . and then issued a written warning shortly

10  thereafter." Doc. 16 at 26. As explained above, Field testified that he thought the timing was

11  "interesting" because it was right before Plaintiff was to begin a harder schedule, and he thought it was

12  "very abrupt" because Field was unaware that Plaintiff had been having any medical issues.

13         Plaintiff suggests Field's comments evince a discriminatory intent because he was "annoyed by

14  [Plaintiff's taking] medical leave and then issued a written warning" approximately three months later.

15  Doc. 16 at 26. But, as discussed in detail above, the June Warning memorialized a number of *undisputed*

16  problems with Plaintiff's performance. In short, Field's comments are not sufficient to rebut Kaplan's

17  legitimate, non-discriminatory reasons for disciplining and terminating Plaintiff. At best, they provide a

18  "weak issue of fact as to whether [Kaplan's] reason [for disciplining and terminating Plaintiff] was

19  untrue," particularly in light of the "abundant and uncontroverted independent evidence that no

20  discrimination has occurred." *Guz*, 24 Cal.4th at 362.

21         *Guz* is illustrative here. In that case, as here, "the record contain[ed] no direct evidence, and little

22  if any circumstantial support" of the plaintiff's claim of age discrimination. *Id.* at 363. Similarly, in that

23  case, as here, the plaintiff "made substantial *concessions to the truth* of [his employer's] proffered

24  nondiscrimination reasons for its decision to eliminate" positions, including his. *Id.* (emphasis in

25  original). The court rejected the plaintiff's claims that those proffered reasons were pretextual because

1   "over time [the employer] ha[d] phrased in different ways its reasons for" terminating employees and its

2   proffered reasons "were unsound, and therefore likely untrue." *Id.* at 364. The court found that the

3   plaintiff "ha[d] essentially conceded that the reasons cited by [his employer] in support of its motion for

4   summary judgment . . . *were the true reasons* why [his employer] decided to eliminate" his position. *Id.*

5   Thus, even the plaintiff's employer used different phrases to explain its actions, and even if its proffered

6   reasons were "debatable on the merits, such facts are of little or no relevance in determining that [the

7   employer's] cited reasons were a mask for prohibited age discrimination." *Id.*

8       As discussed above, Plaintiff does not dispute that Kaplan believed there were numerous

9   problems with his performance. Rather, Plaintiff argues that Kaplan "exaggerated minor misconduct." In

10  doing so, Plaintiff essentially has conceded that Kaplan's proffered reasons for all of its conduct

11  concerning Plaintiff were true. Field's comments therefore have "little or no relevance" in determining

12  whether Kaplan's proffered reasons for its interactions with Plaintiff were true. *Id.* Accordingly, the

13  Court GRANTS Kaplan's motion for summary judgment on Plaintiff's fifth cause of action in Kaplan's

14  favor and against Plaintiff.

**H.     Plaintiff's Sixth Cause of Action.**

16      Plaintiff's sixth cause of action alleges that Kaplan wrongfully terminated in violation of public

17  policy. Compl. at ¶¶ 60-61. Plaintiff's sole argument in opposition is: "Defendant argues the same as

18  above, that the adverse action and treatment were taken for legitimate business reasons. Plaintiff's

19  response is the same as above." Doc. 16 at 27 (citation omitted). Because the Court rejects all of

20  Plaintiff's arguments and finds that Plaintiff has failed to meet his burden under *McDonnell Douglas* to

21  survive summary judgment on his five prior claims, the Court GRANTS Kaplan's motion for summary

22  judgment on Plaintiff's sixth cause of action in Kaplan's favor and against Plaintiff.

**VI. <u>CONCLUSION AND ORDER</u>**

24      For the foregoing reasons, the Court GRANTS Kaplan's motion for summary judgment on all of

1   Plaintiff's claims in Kaplan's favor and against Plaintiff.[30] The trial date of July 28, 2015 is vacated. The

2   Clerk of Court is directed to CLOSE this case.

3   IT IS SO ORDERED.

4       Dated:   __**April 9, 2015**__                           ____**/s/ Lawrence J. O'Neill**____
                                                                 UNITED STATES DISTRICT JUDGE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   _____

25   [30] Because all of Plaintiff's claims fail, the parties' arguments concerning punitive damages therefore are moot, and the Court need not address them. *See* Doc. 11-1 at 31; Doc. 16 at 29-30.